## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

RACHELLE KIESLING and
LAURA WILLIAMS,
individually and on behalf of all others
similarly situated,

          Plaintiffs,

      v.

STIFEL, NICOLAUS & CO., INC. and
STIFEL FINANCIAL CORP.

          Defendants.

Case No.

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

1.     This class action arises out of Stifel's drastic under-payment of interest to its clients in its cash sweep programs. While expressly acting as its clients' agent with respect to its cash sweep programs, Stifel violated its fiduciary, contractual, and implied duties by underpaying its clients to enrich itself and its affiliates at its clients' expense. Rather than pay clients a fair and reasonable rate of interest on their cash balances and put their clients' interests above its own as it was obligated to do, Stifel instead paid *de minimis* rates to its clients, unjustly obtaining for itself and its affiliates hundreds of millions of dollars from that cash during periods of rising interest rates.

2.     In a typical cash sweep program for a brokerage client, the brokerage firm, acting as its client's agent with respect to the cash sweep program, establishes and maintains an interest-bearing sweep account at a participating bank on its client's behalf and automatically transfers or "sweeps" uninvested cash (also known as a "free credit balance") from the client's brokerage account into the sweep account that generates returns for the client. When Stifel sweeps its clients'

cash through its cash sweep programs, however, Stifel uses that cash to generate enormous returns for itself and its affiliates, rather than its clients, by keeping the vast majority of the spread between the interest income that its clients' cash earns and the amount of interest that it passes on to its clients.

3.      As an agent with respect to its cash sweep programs, Stifel is required to act as a fiduciary in the best interests of its clients in connection with those programs. That includes a duty to put its clients' interests ahead of its own when recommending and/or conducting transactions for them within the scope of its cash sweep programs.

4.      Stifel also agreed to provide to retirement account clients a "reasonable rate of interest" on the swept cash.

5.      In addition, the agreement between Stifel and its clients carries with it an implied covenant of good faith and fair dealing. That includes an implied promise that neither party will do anything to frustrate the fruits of the clients' bargain with Stifel.

6.      Rather than act as a fiduciary in the best interests of Stifel's account holders with respect to its cash sweep programs or fulfill its contractual and implied covenant obligations to its clients, Stifel used its clients' funds to enrich itself and its affiliates at its clients' expense.

7.      Stifel underpaid its clients on their sweep account balances while controlling and increasing profits for itself and its affiliates by channeling its clients' cash sweep deposits to affiliated—rather than independent third party—banks. This includes the deposit of its clients' funds with Stifel's subsidiaries, Stifel Bank, Stifel Bank & Trust, Stifel Trust Company, N.A., and Stifel Trust Company Delaware, N.A. Those bank deposits have become Stifel's largest funding source, generating much of Stifel's Net Interest Income ("NII") (the difference between the interest earned on the cash and the interest amounts paid to clients).

8.      Periods of rising interest rates present an opportunity for Stifel clients to earn significant interest on their cash sweep account balances. By improperly keeping interest rates paid on cash sweep accounts artificially low, however, Stifel has usurped such opportunities for itself, leveraging its clients' cash for its own benefit and earning massive profits for itself and its affiliates.

9.      In setting its cash sweep interest rates—which Stifel has kept largely static over the past several years—Stifel has ignored market conditions. For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, and it has been above 5.25% for most of the past year. By contrast, Stifel pays many of its clients with cash sweep accounts an interest rate of only 0.05%, even less than the rate of .15% it was paying in 2022. That is *more than 100 times less* than the prevailing short-term Treasury Bill rate.

10.      There is nothing reasonable or fair about the rates Stifel secured for, and paid to, its clients with cash sweep accounts or about Stifel and its affiliates using its clients' cash balances to reap windfall profits through unreasonable spreads.

11.      Nor does Stifel set reasonable cash sweep interest rates based on competitive interest rates. Brokerages that do *not* sweep their cash to affiliated banks (as Stifel primarily does) typically pay far higher interest rates than Stifel.

12.      Stifel's misconduct constituted, and continues to constitute, an ongoing series of breaches of its fiduciary duties, its contracts with accountholders, and the implied covenant of good faith and fair dealing. Indeed, Stifel's behavior was and continues to be particularly harmful to its clients who have suffered through record inflation over the past few years. Plaintiffs, individually and on behalf of the proposed Class defined herein, bring this class action to remedy the significant financial harm caused by Stifel's misuse of its cash sweep program to enrich itself at the expense of its own clients.

## PARTIES

**A.    Plaintiffs**

13.    Plaintiff Rachelle Kiesling is a citizen of Missouri. She maintains an Individual Retirement Account ("IRA") with Stifel. As a Stifel client, cash balances held in Kiesling's IRA are swept into Stifel's retirement account cash sweep program, which pays unreasonably low interest on those balances. To open and maintain her account with Stifel, Kiesling was required to sign the Stifel Account Agreement.

14.    Plaintiff Laura Williams is a citizen of Missouri. She maintains two IRA accounts with Stifel. As a Stifel client, cash balances held in Williams' IRAs are swept into Stifel's retirement cash sweep program, which pays unreasonably low interest on those balances. To open and maintain her account with Stifel, Williams was required to sign the Stifel Account Agreement.

**B.    Defendants**

15.    Defendant Stifel Financial Corp. ("Stifel Financial") is a Delaware corporation, and a financial holding company with its principal place of business in St. Louis, Missouri, that provides banking, securities, and financial services through several wholly owned subsidiaries.

16.    Defendant Stifel, Nicolaus & Company, Incorporated ("SNC") is a Missouri corporation that maintains its principal place of business in St. Louis, Missouri. SNC is the principal subsidiary of Stifel Financial Corp. and a retail and institutional wealth management and investment banking firm. Stifel's broker-dealer clients are served in the United States primarily through SNC, an investment advisor and broker-dealer registered with the Securities and Exchange Commission ("SEC") and member of the Financial Industry Regulatory Authority ("FINRA").

17.    As used in this Complaint, the term "Stifel" collectively refers to Stifel Financial Corp. and SNC.

4

## RELATED ENTITIES NOT NAMED AS PARTIES

18.    Although not named as defendants, certain affiliated entities are discussed herein, including Stifel Bank, Stifel Bank & Trust, Stifel Trust Company, N.A., and Stifel Trust Company Delaware, N.A. These entities are wholly owned subsidiaries of Stifel and they reaped the benefits of the wrongful conduct alleged herein, which included acting as banks to which Stifel swept Class members' cash as part of Stifel's Cash Sweep Programs.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, codified at 28 U.S.C. § 1332(d). The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and other Class members are citizens of States different from Defendants.

20.    This Court has personal jurisdiction over Defendants because they are incorporated in Missouri and/or have their principal places of business here.

21.    Venue is proper in this District under 28 U.S.C. § 1391 because, among other things, Defendants maintain principal places of business in this District and a substantial part of the events and/or relevant conduct by Defendants and its affiliates giving rise to Plaintiff's claims occurred in this District.

## STIFEL'S CASH SWEEP ACCOUNT MISCONDUCT

**A.    Stifel's Cash Sweep Programs**

22.    Stifel offers two different automatic "Sweep Options": (i) the Stifel Insured Bank Deposit Program ("SIBDP") for non-retirement accounts; and (ii) the Stifel Insured Bank Deposit Program for Retirement Accounts ("SIBDP-RA"). Collectively, these are referred to herein as the "Cash Sweep Programs." These Cash Sweep Programs are offered as an "Automatic Cash Investment Service."

23.    Stifel exercises control and discretion over: (i) the features of its Automatic Cash Investment Services and each of the available Cash Sweep Programs; (ii) the selection of banks in which clients' swept cash is deposited, including for any cash that exceeds FDIC limits; and (iii) the rates of interest ultimately paid to clients on their Cash Sweep Program deposits.

24.    Stifel also ***requires*** that retirement account clients designate the SIBDP-RA as their sweep program upon opening their retirement accounts. For example, Plaintiff Kiesling's SIMPLE IRA Custodial Account Agreement application documents required Kiesling to acknowledge that: "I understand that the Stifel Insured Bank Deposit Program for Retirement Accounts is the ***only sweep option*** available to me, and that I ***must*** be enrolled in the Automatic Case Investment Service to open at IRA at Stifel."[1]

25.    The Stifel Account Agreement and Disclosure Booklet ("Account Agreement")[2] provides that through the Cash Sweep Programs "available cash in a securities account ('Securities Account') . . . will be deposited into interest-bearing deposit accounts ('Deposit Accounts') at . . . banks . . . as set forth in the Priority List . . . (each a 'Bank')."

26.    For Retirement Accounts,[3] ***all*** of the Banks on the Priority List are affiliated with Stifel. For non-Retirement Accounts, the Banks on the Priority List may include only Affiliated Banks or a combination of Affiliated and non-affiliated Banks.

---

[1] All emphasis is added unless otherwise noted.

[2] As of April 2024, the Account Agreement provided that "This [Account Agreement] and the Client Account Profile/ Risk Assessment provided to you, and any supplements, notices, or other disclosures and agreements for the products and services you have elected and may elect in the future for your account(s), which are incorporated by reference (collectively, with the signature document, the 'Agreement') governs the relationship between you and Stifel, Nicolaus & Company, Incorporated."

[3] The Account Agreement defines "Retirement Account" to mean "Securities Accounts held as IRAs (including Roth, SEP, and SIMPLE) . . . .."

27.    Clients can designate a Bank on the Priority List as ineligible to receive that client's funds, but clients cannot change the priority order of Banks on the Priority List or designate all "Excess Banks"[4] as ineligible. Nor can clients choose a bank not on the Priority List.  As of October 1, 2024, Stifel-affiliated banks are the first four banks on each Priority List for Stifel Securities Accounts and one of two Excess Banks, and the ***only*** Banks on the Priority List for Stifel Retirement Accounts.

28.    In the section titled "Disclosure Documents for Automatic Cash Investment," Stifel's Account Agreement provides that Stifel (defined as SNC) acts as its clients' agent, and thus fiduciary, with respect to the Cash Sweep Programs. The Account Agreement states:

> ***Stifel [SNC] will act as your agent and custodian in establishing and maintaining the Deposit Accounts at each Bank.*** Although the Deposit Accounts are obligations of the Banks and not Stifel, you will not have a direct relationship with the Banks. All deposits and withdrawals will be made by Stifel on your behalf.

29.    The Account Agreement further provides:

*Relationship with Stifel*

> ***Stifel is acting as your agent*** in establishing and as your custodian in holding the Deposit Accounts at each Bank, depositing funds in in the Deposit Accounts, withdrawing funds from the Deposit Accounts, and transferring funds among the Deposit Accounts.

30.    The Account Agreement also explains that, ***as its clients' agent***, Stifel will open a money market deposit account ("MMDA") and a linked transaction account ("TA") at one or more of the Banks on the then current Priority List. Once "funds in the Deposit Accounts at a Bank reach the Deposit Limit, Stifel, ***as your agent***, will open an MMDA and TA for you at the next Bank on the Priority Lists and place your additional funds in that Bank."  As such, Stifel operates as an

---

[4] "Excess Banks" are banks that will accept funds without limitation and without regard to the FDIC insurance limits once funds equal to the Deposit Limit have been deposited for the client through the Sweep Programs in each Bank on the Priority List.

agent and fiduciary in selecting the banks and establishing accounts for all account holders who have cash balances swept into the Cash Sweep Programs.

31.     Most of Stifel's Deposit Accounts do not exceed the FDIC limit because the average client cash sweep balance subject to Stifel's Cash Sweep Programs is approximately $9,000. As a result, the vast majority of Stifel's clients' cash is deposited with Stifel's affiliate banks.

32.     The aggregate total of Stifel's Deposit Account balances, the vast majority of which are deposited at affiliate banks, is staggering. As of September 30, 2024, brokerage client cash sweep deposits were over *$9 billion*.

**B.     Stifel Used Its Affiliate Banks to Siphon Interest Income from the Billions of Dollars of Its Clients' Cash Sweep Deposits to Unjustly Enrich Itself**

33.     In creating and operating its Cash Sweep Program, Stifel exercises control over what sweep vehicles it makes available to its clients.  Stifel also exercises control over the setting of the interest rates that its affiliated banks (including Stifel Bank & Trust, Stifel Bank, Stifel Trust Company, N.A., and Stifel Trust Company Delaware, N.S.) pay on its clients' cash balances and on the fees those banks pay to Stifel.

34.     Stifel established, implemented, and maintains the Cash Sweep Programs, including the use of its affiliated banks in the Programs, to take advantage of the cash in Stifel clients' accounts by capturing for Stifel the spread between the interest paid to Cash Sweep Program clients and the interest income it could collect using Cash Sweep Program deposits, by paying clients unreasonably low interest rates while keeping almost all the interest earned at significantly higher rates for itself.

35.     Stifel has derived significant financial benefits for itself from the payment of unreasonably low interest rates on its clients' Deposit Account balances. Stifel's affiliate banks function as a highly profitable arbitrage operation of Stifel, whereby Stifel takes advantage of the

8

nearly-cost-free cash entrusted to it by its clients pursuant to the Cash Sweep Programs and retains for itself the vast majority of the profits generated by its clients' cash deposits.

36.    Stifel has continued to take advantage of its clients' cash sweep accounts, even as regulatory and industry scrutiny of cash sweep accounts increased in late 2023 and 2024, and competitors raised the interest rates paid on cash sweep balances in 2024.

37.    For example, in November 2023, Wells Fargo announced that its cash sweep program was under investigation by the SEC.  Then, in July 2024, both Wells Fargo and Morgan Stanley announced that they were raising interest rates on cash sweep accounts.  Morgan Stanley then announced on August 5, 2024, that the SEC was investigating its cash sweep accounts.

38.    Despite industry scrutiny and recent attention from regulators regarding financial firms' unreasonably low interest rates offered compared to the profits the firms earn on clients' cash deposits, in a Stifel Financial earnings call on July 24, 2024, Ron Kruszewski, Chief Executive Officer of both Stifel Financial and SNC, said that Stifel is "very comfortable" with its Cash Sweep Programs, explaining that Stifel's biggest driver is competitiveness and that its rates have been higher than other firms' "very, very low end" rates of .01% rates on sweep deposits.

39.    On the same earnings call, James Marischen, Chief Financial Offer of both Stifel Financial and SNC, suggested that Stifel's 2.00% rate was competitive in light of recent rate increases to 2% for certain accounts and tiers announced by Wells Fargo, Merrill Lynch, and Morgan Stanley. But Kruszewski later had to clarify that the 2.00% rate cited by Marischen was the highest rate paid by Stifel on any cash balance, *i.e.*, on its highest tier of account balances of $2 million or greater. That rate was not available for accounts with cash balances of less than $2 million. At the time of that call, the rate for Stifel's "very, very low end" balances of up to $100,000 was only 0.15%.

**C.     Stifel Owes Several Independent Duties and Obligations to Its Clients**

40.     Stifel has numerous fiduciary, contractual, and implied duties to its clients with respect to its Cash Sweep Program, including to put its clients' best interest ahead of its own and to pay clients a "reasonable rate" of interest on their cash sweep balances. However, Stifel has breached such duties by appropriating for itself the profits that belong to its own clients.

41.     As a registered investment adviser and broker-dealer, acting as an agent for its clients with respect to the Cash Sweep Programs, Stifel owes several independent duties to its clients, as well as contractual obligations and obligations implied under the law.

42.     SNC is a registered investment adviser bound by the fiduciary duties imposed on it by the Investment Advisers Act of 1940, including duties of care and loyalty. This includes a duty to act in the best interests of its clients, and to place the best interests of its clients ahead of its own self-interest. Similar duties are imposed on Stifel under principles of broker-dealer law and as an agent of its clients with respect to the Cash Sweep Programs.

43.     For all Retirement Accounts, including Traditional, Roth, SEP, and SIMPLE IRAs, both SNC and Stifel Bank were contractually obligated to pay to or secure for its clients a "reasonable rate of interest" on the clients' cash balances.

44.     For all accounts, Stifel agreed to act as an "agent" for its clients with respect to the Cash Sweep Programs, and, as a result, Stifel was required to act as a fiduciary for its clients as its principal with respect to the Cash Sweep Programs.

45.     In addition, Stifel is bound under Missouri law by the implied covenant of good faith and fair dealing to secure for, and pay to, its clients with sweep accounts a fair and reasonable rate of interest.

46.     Stifel breached its express and implied contractual duties and fiduciary duties to its clients by structuring its Cash Sweep Programs in such a way as to automatically deposit cash

balances into its affiliated banks while failing to pay to, or secure for, those clients a fair or reasonable rate of interest.

**1.    Stifel Owes Fiduciary Duties to Its Clients**

47.    As an investment adviser, SNC must adhere to certain standards of care and conduct.

48.    Specifically, SNC owes to its advisory clients (including its advisory IRA accountholders) a fiduciary duty under the Investment Advisers Act of 1940, which is based on equitable common law principles and fundamental to its relationship with its clients. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 33669 (July 12, 2019), 17 CFR § 276 ("Under federal law, an investment adviser is a fiduciary.").

49.    Under this fiduciary duty, Stifel "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.* at 33671.

50.    Stifel owes substantially similar duties to its brokerage clients under broker-dealer rules and regulations, *see* Regulation Best Interest: The Broker-Dealer Standard of Conduct ("Reg. BI"), 84 Fed. Reg. 33318 (July 12, 2019), 17 C.F.R. ¶ 240.15l-1.

51.    Stifel acknowledges and incorporates these duties into its Account Agreement and Relationship Guide documents.[5]

52.    Stifel's Relationship Guide states that "when we recommend a security or an investment strategy involving a security as a broker-dealer to a 'retail client,' ***we must act in your***

---

[5] As of April 2024, the Relationship Guide provided that it "should be read together with the [Account Agreement] and the other disclosures and documents we provide or reference."

**best interest** at the time the recommendation is made, **without placing our financial or other interest ahead of your interest.**" Accordingly, when recommending cash allocation through automatically sweeping free credit balances through the Cash Sweep Programs, Stifel acknowledges and agrees that it should act in its clients' best interests without placing its financial interest ahead of its clients'.

53.    In addition, in creating and operating its Cash Sweep Programs, Stifel not only exercised control over the establishment and operation of the Cash Sweep Programs, including setting the interest rates paid to clients through the Programs, but also agreed to act as an agent (and therefore a fiduciary) on behalf of its clients with respect to the Programs. For example, pursuant to the Account Agreement's section titled "Disclosure Documents for Automatic Cash Investment," SNC agreed:

- to "**act as your agent** and custodian in establishing and maintaining the Deposit Accounts at each Bank";

- to "**as your agent**, [] open an MMDA and a linked TA on your behalf at one or more of the Banks on the then-current Priority Lists in the order set forth on the Priority Lists";

- "Once your funds in the Deposit Accounts at a Bank reach the Deposit Limit, **Stifel, as your agent**, will open an MMDA and TA for you at the next Bank …."; 

- "**As your agent**, Stifel will deposit available cash balances in your MMDA at each Bank as set forth above"; and

- "All withdrawals necessary to satisfy debits in your Securities Account will be made by your Financial Advisor **as your agent**."

54.    Under the heading "Information About Your Relationship with Stifel and the Banks," SNC agreed that:

> Stifel is acting as your agent in establishing and as your custodian in holding the Deposit Accounts at each Bank, depositing funds into the Deposit Accounts, withdrawing funds from the Deposit Accounts, and transferring funds among the Deposit Accounts.

55.     Accordingly, in its capacity as an agent exercising complete control in creating, offering, automatically enrolling, establishing, and maintaining Deposit Accounts under the Cash Sweep Programs, depositing funds into and withdrawing funds from those accounts, and setting the rates paid thereunder, SNC assumed fiduciary duties of loyalty and care to its clients with respect to those accounts.

56.     Similarly, pursuant to the Account Agreement's sections titled "Roth Individual Retirement Custodial Account Agreement" and "SIMPLE Individual Retirement Custodial Account Agreement," Stifel Bank agreed that "By performing services under this agreement, **we are acting as your agent**." The Account Agreement further recognizes that a "[f]iduciary" "means [a] . . . custodian . . . who has a relationship of trust and confidence with, and a duty to act primarily for the benefit of, the equitable owner of the assets of a Security Account," which include Retirement Accounts.

57.     Contrary to its duties to its clients, at the same time that Stifel was supposed to be acting as its clients' fiduciary with respect to the Cash Sweep Program, it was actually acting to advance its own interests, and to enrich itself, at the expense of its clients.

**2.     Stifel Has a Contractual Obligation to Pay and Secure Reasonable Interest Rates for Retirement Account Clients**

58.     For client cash balances maintained in Retirement Accounts, Stifel may utilize those cash balances for investments or loans, but only if it pays to, or secures for, the client a "reasonable rate" of interest on those cash balances.

59.     Both SNC and Stifel Bank in its capacity as IRA custodian explicitly promised in its Account Agreement that Cash Sweep Program deposits would "bear **a reasonable rate of interest**."

60.     Specifically, for example, in the Account Agreement's section titled "Stifel Account Agreement and Disclosure Booklet – Retirement Account Addendum," SNC expressly promises that "When your Retirement Account holds cash balances in FDIC-insured deposits (including CDs) at the Banks, such deposits will bear a reasonable rate of interest as required under the exemption provided by . . . [Internal Revenue] Code Section 4975(d)(4)[.]"

61.     Similarly, in the Account Agreement's sections titled "Roth Individual Retirement Custodial Account Agreement" and "SIMPLE Individual Retirement Custodial Account Agreement," Stifel Bank as IRA custodian, expressly promised that "the deposits or investment of cash balances in . . . deposits issued by Stifel Bank & Trust, Stifel Bank, Stifel Trust Company, N.A., or any other Stifel-affiliated Bank available" "will bear a reasonable rate of interest."

62.     As expressly recognized in its Account Agreement, the agreement to pay a reasonable rate of interest is required to comply with Section 4975 of the Internal Revenue Code ("IRC"). IRC Section 4975 taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account." 26 U.S.C. § 4975(c).

63.     A "disqualified person" includes companies or individuals "providing services to the plan."[6] 26 U.S.C. § 4975(e)(2)(B). This includes banks that receive deposits swept from Stifel client accounts; in this case, the affiliated Sweep Banks, and Stifel Bank in its capacity as IRA custodian.

64.     The Internal Revenue Code provides several "exemptions" or safe harbors for these "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits

_____

[6] "Plan" is defined as including "an individual retirement account described in Internal Revenue Code § 408(a)." 26 U.S.C. § 4975(e)(1)(B).

which bear a reasonable interest rate in a bank or similar financial institution." 26 U.S.C. § 4975(d)(4).

65.     Treasury regulations confirm that when Stifel "invests plan assets in deposits in itself or its affiliates" under an authorization "contained in a plan . . . such authorization must name" such bank or similar financial institution and "must state that such bank or similar financial institution may make investments in deposits which bear a ***reasonable rate of interest*** . . . ." 26 CFR § 54.4975-6(b)(3)(i).

### 3.     Stifel's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for Stifel to Provide Clients with a Fair and Reasonable Rate of Interest

66.     Stifel's client agreements all include an implied covenant of good faith and fair dealing. This implied covenant includes but is not limited to any promises which a reasonable person in the position of the promisee would be justified in understanding were included.  This implied covenant includes but is not limited to a pledge that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  In this case, that implied covenant included a duty for Stifel to secure for, and pay to, its clients a fair and reasonable rate of interest on their cash sweep balances.

67.     For example, in Stifel's Account Agreement's section titled "Stifel Account Agreement and Disclosure Booklet – Retirement Account Addendum," Stifel (there, defined as SNC) expressly agrees that when it acts as a broker-dealer, it has a duty to "***[d]eal fairly*** with you."

68.     Because of Stifel's control and discretion over its clients' cash sweep Deposit Accounts and the returns on those balances, Stifel owes duties to all its clients with cash in Deposit Accounts, which includes a duty to act in their clients' best interests and to place such best interests ahead of Stifel's own self-interest. Stifel breached those duties when it swept client cash into its Cash Sweep Programs that paid clients unreasonably low interest rates.

15

69.     Specifically, with respect to the interest paid through the Cash Sweep Programs, the Account Agreement's section titled "Disclosure Documents for Automatic Cash Investment," includes the following provision:

> The interest rates paid with respect to the Deposit Accounts at a Bank **may be higher or lower than the interest rates available** to depositors making deposits directly with the Bank or other depository institutions in comparable accounts and for investment in money market funds and other cash equivalent investments available through Stifel.

70.     Stifel's statement that the interest rates paid by Stifel might be *higher* than those available to depositors making deposits directly with the Bank or other depository institutions in comparable accounts and for investment in money market funds and other cash equivalent investments available through Stifel would lead a reasonable person in the position of Stifel's clients to be justified in understanding that, while the interest rate paid on Stifel Deposit Accounts might from time to time be lower than the rates available to depositors making deposits directly with the Bank or other depository institutions in comparable accounts and for investment in money market funds and other cash equivalent investments available through Stifel, the interest rates paid by Stiffel would nevertheless be fairly and reasonably comparable to those available to depositors making deposits directly with the Bank or other depository institutions in comparable accounts and for investment in money market funds and other cash equivalent investments available through Stifel.

71.     The Account Agreement also provides, "The interest rates on the Deposit Accounts … will be determined by the **amount the Banks are willing to pay on the Deposit Accounts minus the fees paid to Stifel and other parties**."  This provision would lead a reasonable person in the position of Stifel's clients to be justified in understanding that the interest rates paid by the Banks would be an amount determined by a reasonable arm's-length negotiation between Stifel and the Banks based on the prevailing interest rate environment. It would also lead a reasonable person in

the position of Stifel's clients to be justified in understanding that any fees paid to Stifel or other parties would be fair and reasonable and would not significantly depress the amount of interest rate ultimately paid to clients.

72.     The Account Agreement further provided that:

- "[Deposit Accounts] at each Bank will earn the same interest rate";

- "All Banks will utilize the same Interest Rate Tiers and will pay the same rate of interest on the Deposit Accounts within each Interest Rate Tier"; and

- "Interest rates paid on the Deposit Accounts may change daily. Information regarding current interest rates is available online at www.stifel.com or by calling your Financial Advisor."

73.     Taken together with the provisions discussed above, the Account Agreement reflects the parties' understanding that the interest rates paid by the Banks in Stifel's Cash Sweep Programs would be determined by a reasonable arm's-length negotiation between Stifel and the Banks.

74.     In addition, the Account Agreement's section titled "Stifel Account Agreement and Disclosure Booklet – Retirement Account Addendum" provides, specifically with respect to a retirement account client's cash sweep election, that:

> You understand and agree that Stifel does not act as a fiduciary with respect to any cash balances held as a free credit balance ***pending our account opening process***, because Stifel does not control, or provide recommendations regarding, when you complete your account paperwork so that your sweep program selection becomes effective.

75.     This provision suggests that Stifel ***is*** a fiduciary with respect to cash balances once the retirement account process concludes and the sweep program election becomes effective, which is consistent with the other fiduciary, agency, and best interest provisions of the Account Agreement and Relationship Guide.

76.     In failing to secure for or pay to its clients a fair and reasonable rate of interest, Stifel breached and continues to breach the implied covenant of good faith and fair dealing.

**D.  Stifel Established, Secured, and Paid Unreasonably Low Interest Rates on the Billions of Dollars Its Clients Held in Cash Sweep Accounts**

77.     The interest rates paid to clients pursuant to the Cash Sweep Program are established by Stifel.  Contrary to the terms of Stifel's agreements with its clients, Stifel has not secured for or paid to its clients a fair or reasonable rate of interest on their swept cash.

78.     For example, since 2022, the Federal Funds Rate – the interest rate at which banks lend to one another – increased significantly from a low of 0.08% to a high of 5.33% in 2024. However, during that time period, Stifel failed to secure and pay increasing interest rates on its clients' swept cash, which Stifel deposited with its affiliate banks. Instead, Stifel maintained nearly flat Cash Sweep Program rates during those years, at a fraction of a percent for most tiers, continuing to secure high interest returns for itself on the cash but paying far less than a fair and reasonable rate to clients—thereby retaining the sharply increased spread for itself. This is reflected in the graph below comparing the Federal Funds Rate to Stifel's cash sweep interest rates on cash deposits up to $249,999:



79.     As the foregoing graph illustrates, Stifel derives significant profits from having its

clients' funds invested through its cash sweep program because Stifel pays drastically low interest

rates on its clients' cash balances that are neither fair or reasonable, in violation of its legal,

contractual and implied duties.

80.     Stifel Financial reported in its SEC filings that:

> interest rate changes could affect the interest earned on assets ***differently*** than
> interest paid on liabilities. In our brokerage operations, a rising interest rate
> environment generally results in our earning a larger net interest spread and an
> increase in fees received on our multi-bank deposit sweep program. Conversely, in
> those operations, a falling interest rate environment generally results in our earning
> a smaller net interest spread.

Stifel Financial, Form 10-K, at 13 (Feb. 16, 2024).

81.     Stifel's Account Agreement does not specify the applicable interest rates paid to

clients on their Deposit Account balances. Instead, Stifel directs clients to a website to obtain

current interest rate information. Over the past several years, Stifel has set artificially low cash

sweep rates including as compared to numerous industry benchmarks.

82.    Below is a chart listing exemplary Annual Percentage Yield rates in each of the previous five years for each of Stifel's Cash Sweep Account tiers:

| Balance From | Years Ending<br>Balance To | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| $1 | $99,999 | 0.01% | 0.01% | 0.15% | 0.15% | 0.15% |
| $100,000 | $249,999 | 0.01% | 0.01% | 0.30% | 0.30% | 0.30% |
| $250,000 | $499,999 | 0.01% | 0.01% | 0.45% | 0.45% | 0.45% |
| $500,000 | $999,999 | 0.01% | 0.01% | 0.65% | 0.65% | 0.65% |
| $1,000,000 | $1,999,999 | 0.01% | 0.01% | 1.50% | 1.50% | 1.50% |
| $2,000,000 | - | 0.01% | 0.01% | 2.00% | 2.00% | 2.00% |

83.    Stifel established, implemented, and maintains the Cash Sweep Program to maximize its profits through increased NII by securing for and paying to its clients unfair and unreasonably low interest rates from its affiliate banks, while appropriating almost all of the interest earned at significantly higher rates for its own benefit.

84.    IRS regulations define an "arm's-length interest rate" as:

a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 C.F.R. § 1.482-2(a)(2).

85.    In 2003, the Department of Labor issued an exemption to certain transactions and, in granting the exemption, gave the following definition of a "reasonable" rate of interest:

A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, 34648 (June 10, 2003).

86.     Under these terms, and any reasonable understanding of what a reasonable rate of interest is, Stifel did not secure or pay to its clients, including Plaintiff and Class members, a reasonable rate of interest on their cash sweep accounts.

### 1.    Sweep Account Rates Paid by Other Institutions

87.     The interest rates paid by other brokerages that sweep cash demonstrate that the interest rates paid by Stifel to cash sweep accountholders were not fair or reasonable. This includes brokerages that sweep cash to a bank that is not affiliated with the brokerage, such as Fidelity.

88.     As shown in the graph below, the interest rates paid by five brokerages that did ***not*** sweep client cash balances to a bank affiliated with the brokerage more closely track the movement of the Federal Funds Rate (set forth above) than Stifel's *de minimis* cash sweep rates. By contrast, the interest rate that Stifel paid its clients was much lower during much of the relevant time:



89.     As shown in the above graph, Stifel sweep rates had minimal movement, even as the sweep rates paid by brokerages using unaffiliated banks increased during 2018 and 2019 and remained much higher than Stifel's until the beginning of 2020. In addition, when rates rose again

starting in mid-2022, Stifel's sweep rate stayed consistently low with miniscule increases while the rates paid by brokerages that swept cash to unaffiliated banks increased significantly.

90.      Specific brokerage firms that swept cash to unaffiliated banks paid interest rates that more closely resembled arm's-length negotiations, and therefore at least partially reflected prevailing market conditions, compared to the rates paid by Stifel. For example,

- As of July 27, 2023, Robinhood offered a rate of 4.9% for Robinhood Gold members.

- As of July 23, 2024, WeBull offered a rate of 5%.

- As of year-end 2022, Fidelity Investments paid 2.21% interest on cash balances regardless of asset tier.

- As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of asset tier.

- As of year-end 2022, R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million).

- As of January 12, 2024, R.W. Baird paid between 2.03% interest (on cash balances up to $1 million) and 4.11% interest (on cash balances above $5 million).

- Currently, the interest rate offered by Vanguard on its sweep program is 3.65% regardless of asset tier.

**2.      The Federal Funds Rate Benchmark**

91.      A number of interest rate benchmarks increased significantly over the past several years, but Stifel's rates barely changed or changed by only miniscule amounts (in its higher asset tiers).

92.      A benchmark interest rate is an interest rate that is commonly used to determine other interest rates and that generally reflects prevailing market conditions. One of the most common and important benchmark interest rates is the Federal Funds Rate.

93.     The Federal Funds Rate benchmark further demonstrates that the interest rates paid to Stifel cash sweep accountholders were not reasonable.

94.     The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises. In other words, it is the market of unsecured borrowing transactions, principally between banks. The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

95.     The Federal Funds Rate increased significantly in recent years. For example, the effective Federal Funds Rate on August 28, 2024, was 5.33%. The graph below (the same as reproduced above) shows the Federal Funds Rates over the past several years and the rate paid on the Cash Sweep Programs on deposits up to $249,999. As the comparison shows, the interest rates paid to Stifel cash sweep account clients have been drastically lower and have failed to reflect changes in the market:



96.    The above graph demonstrates that the interest rates Stifel secured for and paid to its sweep account clients were not reasonable, when considered in light of prevailing market conditions. As shown, Stifel's sweep rate on its lowest asset tiers did not change despite significant swings in the Federal Funds Rate.

### 3.    The Interest Rates on United States Short-Term Debt Benchmark

97.    The yield on short-term U.S. Treasury Bills also demonstrates that the interest rates paid on Stifel cash sweep accounts were not reasonable. U.S. Treasury Bills are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks. They are sold at a discount to their face value, and when they mature, the investor is paid the face value. Treasury Bills are considered safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

98.    The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage. As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill: (i) increased from early 2017 through mid-2019; (ii) dropped to close to zero during the COVID pandemic; and (iii) steadily increased from close to zero in early 2022 to approximately 5.5% in mid-2023, and remained at approximately that level through August 2024:



99.     During the entire timeframe when the U.S. Treasury Bill yield was appreciably above zero, the interest rate Stifel paid to cash sweep account holders remained a fraction of that benchmark.

**4.      The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements**

100.    The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2019 to the present were also significantly higher than Stifel's cash sweep account interest rates. This further demonstrates that the interest rates paid on Stifel cash sweep accounts were not reasonable.

101.    A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities. In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price. The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the

period. The security serves as collateral for the lender. A repo can be based on any security, but it usually involves government debt or other debt instruments with steady values.

102.    The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs. From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023. These rates are significantly higher than the cash sweep interest rates offered by Stifel.

**E.    Stifel Breaches Its Duties, Contracts and the Implied Covenant Through Its Operation of Its Cash Sweep Programs**

103.    Stifel has breached and continues to breach its contractual agreements to secure reasonable interest rates for its clients' deposits, and its implied covenant to pay its clients a fair and reasonable rate of interest.

104.    Stifel breached, and continues to breach, such obligations by creating and operating for its own principal benefit its Cash Sweep Programs, over which it exercises complete control, all while failing to pay or secure fair or reasonable rates of interest on client cash balances.

105.    Through its legal and contractual duties, Stifel was obligated, but failed, to: (i) set, secure, and pay fair and reasonable interest rates on clients' cash balances deposited through the Cash Sweep Programs; and (ii) elevate its clients' interests above its own in creating, implementing, maintaining, recommending, and operating the Cash Sweep Programs.

106.    Stifel's continual sweep of Plaintiffs' and the Class members' cash into the Cash Sweep Programs, while paying them unfair and unreasonably low interest rates, constitutes a continuing wrong and was an ongoing and continuing series of breaches of Stifel's duties to, and contracts with, Plaintiffs and the Class members. Each time Stifel placed Plaintiffs' and Class

members' cash into the Cash Sweep Programs and/or underpaid interest on such cash, Stifel newly injured Plaintiffs and the Class members.

**F.    Stifel Has Unjustly Enriched Itself at Its Clients' Expense Through Its Operation of Its Cash Sweep Programs**

107.    The relationships between Stifel and its clients, the imbalance of negotiating power between Stifel and its clients, and Stifel's exercise of control over the interest paid through the Cash Sweep Programs are circumstances that create an equitable obligation (in addition to any fiduciary or contractual duty) running from Stifel to its clients.

108.    Stifel's conduct of failing to pay to or secure for its clients a fair or reasonable rate of interest on their cash balances, and instead retaining that interest income for itself, unjustly and inequitably enriches Stifel at the expense of its clients.

109.    Stifel gained significant financial benefits from the cash balances swept into its Cash Sweep Programs through the spread between the amounts Stifel earns on the Deposit Accounts in the form of interest and fees and the amounts paid to its clients.

110.    Stifel's significant increase in NII beginning in 2021 was due to Stifel breaching its duties to its clients, appropriating to itself the benefit of the rising interest rate environment, and failing to pass on such benefit to its clients for whom it acted as an agent and fiduciary.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs seek certification of the following Class:

> **Clients of Stifel who held cash deposits or balances in Stifel's Cash Sweep Programs from March 18, 2015, through the end of the misconduct alleged herein.**

112.    Plaintiffs reserve the right to amend the Class definition if further investigation and discovery indicates that such definition should be narrowed, expanded, or otherwise modified.

113.    Excluded from the Class are Stifel and any of its affiliates, legal representatives, employees, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiffs and the proposed Class, including other attorneys and staff at each respective firm.

114.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

**Numerosity**
**Rule 23(a)(1)**

115.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time. However, Stifel's wealth management program provides financial planning and advisory services through the work of over 2,300 financial advisors with over $400 billion in client assets under management. Accordingly, Plaintiffs and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**Existence and Predominance of Common Questions of Law and Fact**
**Rule 23(a)(2), 23(b)(3)**

116.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.    whether Stifel owed fiduciary duties and other duties of care to the Class, and whether Stifel breached those duties;

b.    whether Stifel's interest rates paid on its sweep accounts were fair and reasonable;

c.    whether Stifel breached the contractual terms of its Account Agreement and other written communications to Class members;

      d.      whether Stifel breached the implied covenant of good faith and fair dealing;

      e.      whether Stifel was unjustly enriched by its wrongful conduct;

      f.      whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

      g.      whether and to what extent Class members are entitled to damages and other monetary relief; and

      h.      whether and to what extent Class members are entitled to attorneys' fees and costs.

117.    Stifel's Account Agreement expressly contains a choice of law provision that provides, in relevant part, that its interpretation and enforcement shall be governed by the laws of Missouri.

118.    Stifel's Account Agreement further defined the Applicable Law governing transactions associated with clients' Securities Accounts as:

> the rules and regulations of the U.S. Securities and Exchange Commission ("SEC"), U.S. securities exchanges, Financial Industry Regulatory Authority, Inc. ("FINRA"), and self-regulatory organizations ("SROs"), U.S. federal and state securities laws, other applicable U.S. federal, state, and local laws and regulations, including, without limitation, the U.S. Internal Revenue Code of 1986, as amended (the "Code") and, where applicable, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (ii) applicable laws, rules, regulations, and market practice of any non-U.S. jurisdiction; and (iii) applicable rules, regulations, customs, and provisions of the constitution (or comparable document) of any exchange, electronic communication network, securities association, alternative trading system, market, clearing system, clearinghouse, or depository, as any of (i)-(iii) are in effect from time to time.

**Typicality**
**Rule 23(a)(3)**

119.    Plaintiffs' claims are typical of the claims of the Class because they were account holders with Stifel that were paid unfair and unreasonably low interest rates in their cash sweep accounts. Thus, Plaintiffs' claims are typical of the claims of the Class members as they arise from

the same course of conduct by Defendants, and the relief sought within the Class is common to the Class members.

### Adequacy of Representation
### Rule 23(a)(4)

120.    Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

### Superiority
### Rule 23(b)(3)

121.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

122.    Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

123.    Superiority is particularly satisfied here, where the law of a single state will apply. Under the uniform contract terms with Stifel, the law of Missouri will apply to each Class

member's claims, allowing the Court to adjudicate the claims of all Class members under a single

state analysis.

124.    In addition, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

    b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

### FIRST CLAIM FOR RELIEF
**Breach of Contract**

125.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual

allegations above as if fully set forth herein, and bring this claim against Defendants SNC and

Stifel Financial Corp.

126.    SNC's governing documents related to its Cash Sweep Programs constitute a

binding agreement between SNC and its accountholders. For example, relevant provisions of the

Account Agreement establish contractual relationships between SNC and its accountholders.

127.    The governing documents provide that both SNC will pay to, or secure for, its

clients a "reasonable rate of interest" on cash deposits or balances maintained in the Cash Sweep

Programs.

128.    As set forth herein, SNC failed to pay to or secure for Plaintiffs and the Class a

"reasonable rate of interest" on those deposits; therefore, SNC breached the contracts.

129.    SNC's past, continuous, and ongoing breach damaged and continues to damage Plaintiffs and the Class.

130.    Defendant Stifel Financial Corp. knowingly encouraged, directed, and participated in SNC's breaches of contracts and knowingly received the benefits thereof, and Stifel Financial Corp. and SNC are therefore jointly and severally liable therefor.

131.    Stifel Financial Corp is also liable for such breaches, including under the doctrine of respondeat superior, because SNC is a wholly owned subsidiary and agent of Stifel Financial and committed breaches of contracts within the scope of its corporate principal-agent relationship.

## SECOND CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing

132.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim in the alternative against Defendants SNC and Stifel Financial Corp.

133.    SNC's governing documents related to its accounts constitute a binding agreement with those accountholders.

134.    Implicit in these contracts (all of which incorporated SNC's Cash Sweep Programs), and under Missouri law which governs them, is a covenant of good faith and fair dealing, requiring SNC to deal fairly with its clients, to fulfill its obligations under the contract in good faith, and to not deprive Class members of the fruits of their bargain.

135.    Through the implied covenant of good faith and fair dealing, SNC was obligated to pay to or secure for Class members a fair and reasonable rate of interest on their cash balances, and to account for current or prevailing market conditions and competitive interest rates. By failing to do so, SNC breached the implied covenant of good faith and fair dealing.

136.     SNC's past, continuous, and ongoing breach of the implied covenant damaged and continues to damage Plaintiffs and the Class.

137.     Defendant Stifel Financial Corp. knowingly encouraged, directed, and participated in SNC's breaches of the implied covenant and knowingly received the benefits thereof, and Stifel Financial Corp. and SNC are jointly and severally liable therefor.

138.     Stifel Financial Corp is also liable for such breaches, including under the doctrine of respondeat superior, because SNC is a wholly owned subsidiary and agent of Stifel Financial and committed breaches of the implied covenant within the scope of its corporate principal-agent relationship.

## THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty

139.     Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein.

140.     Acting as an agent and investment advisor on behalf of its clients, SNC owed fiduciary duties to Plaintiffs and Class members with respect to the Cash Sweep Programs.

141.     These duties include, but are not limited to:

　　a.     a duty of care;

　　b.     a duty of loyalty;

　　c.     a duty to act in the best interests of its clients; and

　　d.     a duty not to place Stifel's interests above those of its clients.

142.     SNC breached each of the foregoing duties when it (i) failed to pay to or secure for Plaintiffs and the Class a fair or reasonable rate of interest on cash balances in their Cash Sweep Program Deposit Accounts; (ii) failed to act in the best interests of Plaintiffs and the Class vis-à-

vis the Cash Sweep Programs; and (iii) recommended to Plaintiffs and the Class that they utilize and continue to utilize the Cash Sweep Programs.

143.    SNC's past, continuous, and ongoing breach of duties damaged Plaintiffs and the Class.

144.    Defendant Stifel Financial Corp. knowingly encouraged, directed, and participated in the breaches of fiduciary duty by SNC and knowingly received the benefits thereof, and Stifel Financial Corp. and SNC are jointly and severally liable therefor.

145.    Stifel Financial Corp is also liable for such breaches, including under the doctrine of respondeat superior, because SNC is a wholly owned subsidiary and agent of Stifel Financial Corp and committed breaches of fiduciary duties within the scope of its corporate principal-agent relationship.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**

146.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim in the alternative to the preceding Claims.

147.    As a result of the wrongful conduct of SNC and Stifel Financial Corp., acting in concert in connection with an integrated plan, Plaintiffs and the Class received unfair and unreasonably low interest payments on their cash sweep deposits.

148.    As a result of the wrongful conduct of SNC and Stifel Financial Corp., these defendants were unjustly enriched because they received significantly and increasingly greater profits than they would have but for their wrongful conduct.

149.    SNC and Stifel Financial Corp. appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class.

150.    It would be inequitable and unjust for SNC and Stifel Financial Corp. to retain the benefits they wrongfully obtained from Plaintiffs.

151.    SNC and Stifel Financial Corp.'s retention of those wrongfully obtained benefits would violate the fundamental principles of justice, equity, and good conscience.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, demand judgment and relief as follows:

a.    certifying the proposed Class, and appointing Plaintiffs and their counsel to represent the proposed Class;

b.    awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

c.    awarding Plaintiffs and Class members restitution, disgorgement of profits, and forfeiture of compensation;

d.    awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

e.    awarding such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

DATED: March 18, 2025

Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

*/s/ Matthew L. Dameron*
Matthew L. Dameron        MO Bar No. 52093
Claire M. Terrebonne      MO Bar No. 60766
1100 Main Street, Suite 2600
Kansas City, MO 64105
Telephone: (816) 945-7110
matt@williamsdirks.com
cterrebonne@williamsdirks.com

Michael J. Angelides #43650 (MO)
**SIMMONS HANLY CONROY LLP**
231 S. Bemiston Avenue, Suite 525
Saint Louis, MO 63105
Telephone: (618) 693-3104
mangelides@simmonsfirm.com

Thomas I. Sheridan, III #1398791 (NY)
Sona R. Shah #2927242 (NY)
**SIMMONS HANLY CONROY LLP**
112 Madison Avenue
New York, NY 10016
Telephone: (212) 784-6404
tsheridan@simmonsfirm.com
sshah@simmonsfirm.com

Bruce D. Oakes #52545 (MO)
Richard B. Fosher #50342 (MO)
**OAKES & FOSHER, LLC**
1401 Brentwood Boulevard, Suite 250
Saint Louis, MO 63144
Telephone: (314) 804-1412
boakes@oakesfosher.com
rfosher@oakesfosher.com

Salvatore J. Graziano #2470714 (NY)
John Rizio-Hamilton #4323846 (NY)
Adam Wierzbowski #4203675 (NY)
Michael Blatchley #4747424 (NY)
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

36

1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
adam@blbglaw.com
michael@blbglaw.com

Michael Dell'Angelo #80910 (PA)
Alex B. Heller #321134 (PA)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
aheller@bm.net

Alan L. Rosca #84100 (OH)
Jonathan A. Korte #126450 (FL)
**ROSCA SCARLATO LLC**
2000 Auburn Drive, Suite 200
Beachwood, OH 44122
Telephone: (216) 946-7070
arosca@rscounsel.law
jkorte@rscounsel.law

Paul J. Scarlato #47155 (PA)
**ROSCA SCARLATO LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (216) 946-7070
pscarlato@rscounsel.law

***Counsel for Plaintiffs and the Proposed Class***